UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Donna Rose and Paul Palmer,

        Plaintiffs,

                               Case No: 15-13567
                               Hon. Victoria A. Roberts

v.

Delta Airlines, Inc., and
Wayne County Airport Authority,

        Defendants.

_____/

**ORDER DENYING PLAINTIFFS' EMERGENCY MOTION FOR A TEMPORARY
RESTRAINING ORDER AND/OR MOTION FOR PRELIMINARY INJUNCTION**

**I.    Introduction**

      Paul Palmer and Donna Rose ("Plaintiffs") seek a Temporary Restraining Order

("TRO") and/or Preliminary Injunction under FED. R. CIV. P. 65 and Local Rule 65.1 to

prevent Defendants Wayne County Airport Authority ("WCAA") and Delta Airlines, Inc.,

("Delta") from implementing new Ground Transportation Regulations at Detroit

Metropolitan Wayne County Airport ("DTW"), particularly Section 13. *Ground Trans.*

*Reg. for Detroit Metro. Wayne County Airport*, ECF No. 39 Ex. 1 ("Regulations"). They

are set to go into effect on April 4, 2016.

      The Regulations pertain to pick-up and drop-off points for persons with

disabilities who arrive at DTW by intercity public transportation providers such as

Michigan Flyer.  Importantly, in their Supplemental Memorandum of Law, Plaintiffs

specifically ask the Court to enjoin implementation of the Regulations as to intercity public transportation providers.  Plaintiffs say the established stop at the McNamara Terminal Ground Transportation Center ("GTC Stop") is inaccessible and the new stops under the Regulations ("New Stops") are segregated. Plaintiff contend all stops are illegal.  The New Stops are: (1) McNamara Departures Level Curb; (2) Door 402; and (3) Stall 5.

At the heart of Plaintiffs' Complaint is their faulty premise that by law, they are entitled to the shortest accessible route into DTW.  They may eventually lose their battle since all of their claims arise from this faulty premise, and they direct the Court to no supporting law.  The Court must evaluate the merits of the Complaint even though the Motion for TRO deviates far from the Complaint.

The Court **DENIES** the TRO.  The issues surrounding the GTC Stop have largely been litigated by parties in privity with Plaintiffs, as will be discussed below.  Plaintiffs cannot show that the GTC Stop is inaccessible.  And, the New Stops under the Regulations provide Plaintiffs with much of the relief they seek in this litigation: Door 402 access and access to other similarly close locations.  Accordingly, there is nothing to enjoin.

Because the Court finds that Plaintiffs have not shown a strong likelihood of success on the merits or irreparable harm, the Motion is **DENIED**.

## II.    Background

Plaintiffs say Defendants operated a single, all-inclusive public bus stop at International Arrivals for approximately five years before moving public transportation to

2

the far end of the Ground Transportation Center ("GTC").  The GTC Stop is approximately 600 feet from the entrance to the McNamara GTC Terminal.

Plaintiffs challenge the WCAA's relocation of intercity public transportation providers.  These providers are identified in the complaint as SMART, Michigan Flyer and AirRide.  The stop was relocated due to safety and congestion concerns at International Arrivals.  Plaintiffs stress that not all transportation providers were required to move; for example, they say WCAA continues to allow Great Lakes Bus, the Airport and Delta Employee Shuttle to use the International Arrivals location.

The first challenge to the GTC Stop was in 2014 litigation before Judge David Lawson, *Harris v. Wayne Cty. Airport Auth.*, No. 14-13630, 2015 WL 4611376, at *2 (E.D. Mich. July 27, 2015) ("*Lawson I*").  In that case, different plaintiffs filed a complaint alleging that ground access to the airport is unsafe for persons with disabilities.  *Id.* at *1.  Plaintiffs sought to enjoin the WCAA from relocating public transportation from International Arrivals to the GTC Stop.  *Id.*

*Lawson I* settled after Judge Lawson denied Plaintiffs' motion for a temporary restraining order. Under the Settlement Agreement, Plaintiffs accepted the relocation to the GTC Stop in exchange for several modifications to "cushion the impact of the change on persons with disabilities."  One plaintiff in *Lawson I* explained her objective for entering into the Settlement Agreement was to "create an environment that was safe for persons with disabilities and would offer similar protections from the harsh winter elements as existed at International Arrivals, albeit with a new and much longer walk."

The agreed upon changes included removing a parking space so buses could unload more safely, installation of heating elements within bus shelters, and room for a

3

customer service and information desk.  *Settlement Agreement*, ¶¶ 1.A, 1.D and 1H. Later, Judge Lawson denied plaintiffs' motion to enforce the terms of the Settlement Agreement; he found that plaintiffs failed to show WCAA violated or failed to perform any specific term of the Settlement Agreement.

In 2015, Michigan Flyer and Indian Trails filed a case against WCAA, which was also heard by Judge Lawson.  *Michigan Flyer, LLC v. Wayne Cty. Airport Auth.*, No. 15-11512, 2015 WL 5836052, at *1 (E.D. Mich. Oct. 7, 2015) ("*Lawson II*").  They alleged WCAA retaliated against them for their support of plaintiffs in *Lawson I*.  *Lawson II* was dismissed.

In the case now before the Court, different Plaintiffs represented by the same lawyer and representing the interests of Michigan Flyer again, challenge the location of the GTC Stop despite the Settlement Agreement.  They say the distance disabled persons must travel for access inside DTW is too far.  Plaintiffs seek to have intercity public transportation bus providers at DTW board at a location with the shortest accessible route.  They say in their Complaint that this location at the McNamara Terminal would be "Door 402," an area outside a sliding door between the indoor GTC waiting area and the outside sidewalk.  ECF No. 1 at ¶¶ 3, 101; *see also, Harris v. Wayne Cty. Airport Auth.*, No. 14-13630, 2015 WL 4611376, at *7.

Count 1 alleges the WCAA violates the Americans with Disabilities Act ("ADA") and its regulations because the GTC Stop is located at the farthest corner of the GTC which is approximately 600 feet from Door 402.  Count 2 is a claim under Part B of the ADA that alleges WCAA breaks the law by not locating the public bus stop immediately outside Door 402, the "shortest accessible route."  Count 3 is only against Defendant

4

Delta in its role as the operator and tenant at DTW.  Plaintiffs say Delta discriminates against individuals with disabilities by failing to provide reasonable access to facilities. Count 4 alleges violations of Title V of the ADA against both Defendants for interfering with Plaintiffs' right to access public transportation. Count 5 is a claim under Section 504 of the Rehabilitation Act of 1973 – that Plaintiffs do not have equal access to DTW. Count 6 is a state law claim under Article III of the Michigan Persons with Disabilities Civil Rights Act.  Count 7 is an Equal Protection claim; Plaintiffs say other transportation providers – but not public transportation providers –  are given preferential access to DTW, and they say public transportation is a service disproportionately relied on by Plaintiffs and those similarly situated.

Although the Complaint alleges violations under the state and federal laws mentioned above, in the Motion for TRO, Plaintiffs rely almost exclusively on allegations that Defendants violate the ADA and Rehabilitation Act of 1973.  Accordingly, in analyzing whether Plaintiffs are likely to succeed on the merits, the Court focuses on their likelihood of success under these statutes.

## III.    Legal Standard

Under Federal Rule of Civil Procedure 65, the Court may issue a temporary restraining order where the moving party demonstrates irreparable injury, loss, or damage before the adverse party can be heard in opposition.  FED. R. CIV. P. 65(b)(1)(A).  A harm is not irreparable if it is fully compensable by money damages. *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992).

In determining whether to issue a temporary restraining order, the Court considers the following factors: "(1) whether the claimant has demonstrated a strong

5

likelihood of success on the merits, (2) whether the claimant will suffer irreparable injury in the absence of a stay, (3) whether granting the stay will cause substantial harm to others, and (4) whether the public interest is best served by granting the stay." *Workman v. Bredesen*, 486 F.3d 896, 905 (6th Cir. 2007).

## IV.    Discussion

### A.    Plaintiffs are Not Likely to Prevail on the Merits

Plaintiffs repeatedly reference the overarching goal and purpose of the ADA, the Rehabilitation Act and regulations accompanying these statutes: to eliminate disability based discrimination and other barriers to public services for individuals with disabilities. Americans with Disabilities Act of 1990, 42 U.S.C. § 12132; Rehabilitation Act of 1973, 29 U.S.C. §794.

While the Rehabilitation Act and ADA have different causation standards, as described in *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 314 (6th Cir. 2012), the Court finds Plaintiffs are not likely to succeed under either one.

Plaintiffs' core argument is that the GTC Stop is illegal because it is not the shortest accessible route and because outdoor conditions are hazardous to their health. They say the New Stops constitute segregation.  Plaintiffs say segregated bus stops are at variance with the ADA and the Rehabilitation Act which require accommodations to be made in an integrated manner. Since the bus has to stop at the new closer locations anyway, Plaintiffs suggest the way to eliminate the alleged segregation is to allow all intercity public transportation users to use the New Stops, including people without disabilities. ECF No. 26 at 12.

The Court holds: (1) Defendants are not lawfully required to provide the shortest

6

accessible route; (2) the Regulations provide equal access to people with disabilities; (3) the Regulations do not burden persons with disabilities to travel farther than other persons; and (4) the Regulations provide an entirely accessible route for people with disabilities to and from the airport, and they do so on a non-segregated basis.

### 1.   THE DEFENDANTS' NEW REGULATIONS DO NOT ESTABLISH A SEGREGATED BUS STOP

#### a.   Individuals will not have to report their disability

Plaintiff Palmer says that he does not have the option of using the GTC Stop because he is wheelchair bound and he has difficulty communicating.  He says because of his communication difficulties, he cannot seek assistance when he arrives at the GTC.  Plaintiffs extrapolate -- from this inaccessibility argument -- that the only options now available to them are the New Stops which Plaintiffs say are segregated, but they do not explain how.

Part of the problem is that Plaintiffs filed the Motion for a TRO before the Regulations were fully finalized; under the final Regulations their characterization of the new services as "segregated" is flawed:

> The plan will require Plaintiffs, and those similarly situated, to report their disability to their transportation provider, who then and only then, will be allowed to use the segregated stop, with the rest of their non-disabled passengers waiting on board for the individual with a disability to unload or load, before proceeding to the current, inaccessible stop in the Ground Transportation Center.

ECF No. 26 at 9.

The logistics of how the new process will work is quite different than the picture painted by Plaintiffs. Plaintiffs will not have to report their disability to transportation providers.  Under the Regulations, when a Ground Transportation Operator enters DTW

at the McNamara Terminal, the driver will announce: "[p]assengers with a disability or needing extra time or assistance may remain onboard with their travel companions and be dropped off closer to the terminal." *Regulations* at Section 13(D)(a). The driver will drop off passengers at the GTC Stop before dropping off any passengers who request accommodation at the McNamara Departures Level Curb. *Id.* If passengers remain on board to go on to the North Terminal, persons requesting accommodation will be dropped off before the bus continues to the North Terminal.

It does not appear that Plaintiffs challenge the Regulations as they pertain to the North Terminal.

The Regulations say the WCAA will not inquire or force anyone to disclose information in order to use the New Stops:

> Under no circumstance may a Ground Transportation Operator, its employees, or its agents inquire about or require any person to disclose any medical condition, or disability in connection with the use of these accommodations by an individual with a disability. If an individual requests accommodation, a Ground Transportation Operator should presume the individual has a disability and provide the accommodation.

*Regulations* at Section 13 (C)(d).

No evidence is presented that Plaintiffs will have to report their disabilities.

### b.   The Regulations appear to meet legally mandated requirements

Plaintiffs are correct that both the ADA and the Rehabilitation Act require accommodations to be executed in an integrated manner, and that pertinent regulations broadly encourage integrated services. For example, Title II of the ADA says, in part:

"A public entity shall administer service programs, and activities in the most

8

integrated setting appropriate for the needs of qualified individuals with disabilities."  28 C.F.R. §35.130(d).  See also,  49 C.F.R. §27.7(b)(iv).

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services ... of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The ADA accessibility guidelines require airports to ensure terminal facilities are accessible and usable by individuals with disabilities, including those who use wheelchairs. 49 C.F.R. §27.71(b).

The new Regulations appear to meet legally mandated requirements. The choice of stop belongs solely to the passenger; any rider may still use the standard location, the GTC Stop, or avail him or herself of a New Stop.  *Regulations* at Section 13(B),(C). No individual with a disability, including Plaintiff Palmer, must use the GTC Stop.  Thus, there is neither impermissible exclusion nor denial of benefits.

### c.     The Regulations do not require advance reservations

Separate from their identification argument, Plaintiffs say there is a discriminatory impact if a disabled passenger has to make an advance reservation while other passengers receive immediate service.  In reliance, Plaintiffs refer to the Department of Transportation's ("DOT") interpretation of the ADA which says it is discrimination for any operator to:

> (c) Require or request a passenger with a disability to reschedule his or her trip, or travel at a time other than the time the passenger has requested, in order to receive transportation as required by this subpart;
>
> (d) Fail to provide reservation services to passengers with disabilities equivalent to those provided other passengers.

49 C.F.R. § 37.207.

9

The Regulations do not violate this DOT provision; they do not require rescheduling and reservation services are equivalent.  For pick-ups at the McNamara Terminal: whether drivers pick up passengers from the GTC Stop before going on to the New Stop outside Door 402 depends on whether the location outside of Door 402 is South or North of the drivers' standard pick-up location.  *Regulations* at Section 13(D)(b)(i) and (ii).  Only an individual who has requested an accommodation will be picked up at the New Stop.  *Id.*  Section 13 of the Regulations says nothing about making a reservation; it says a Ground Transportation Operator must pick up an individual who "makes a request for accommodation."  *Regulations* at Section 13(D)(b).

Furthermore, improvements to customer service and the installation of telephones per the recent Settlement Agreement suggest there are ways Plaintiffs will be able to arrange for a pickup other than to make an advance reservation.  *Settlement Agreement*, 1(E) and (H).

The Regulations do not explain how this request is made, but Plaintiffs have not shown this type of request for accommodation is equivalent to an illegal advance reservation and they rely on no other authority for their proposition. As WCAA correctly points out, these regulations only say that if reservation services are available to some passengers, they must also be available to passengers with disabilities.

WCAA distinguishes this case from the example of prohibited segregation discussed in federal regulations:

> Under the ADA, an entity may not consign an individual with disabilities to a separate, "segregated," service for such persons, if the individual can in fact use the service for the general public.  This is true even if the individual takes longer, or has more difficulty, than other persons in using the service for the general public.

> One instance in which this principal applies concerns the use of designated priority seats (e.g., the so-called "elderly and handicapped" seats near the entrance to buses). A person with a disability (e.g., a visual impairment) may choose to take advantage of this accommodation or not. If not, it is contrary to rule for the entity to insist that the individual must sit in the priority seats.

49 C.F.R. §37.5.

Based on this, WCAA correctly says that prohibited segregation results only from forcing or insisting that people with disabilities use a certain service or accommodation. That is not the case here. The New Stops are additional accommodations which passengers can request; a person may choose to take advantage of them or not.

Additionally, WCAA says passengers traveling to and from DTW have the option to request assistance from Prospect Services; this service provides wheelchair and mobility assistance in the terminal and the GTC:

> Thus, a passenger arriving at the Airport can request ahead of his or her arrival that Prospect meet the passenger at the current bus stop location, the passenger can dial Prospect once he or she arrives there and request assistance, or the passenger can request that the bus driver dial Prospect upon arrival in the GTC. (**Exhibit A**, Bachmann Declaration, ¶ 5 (stating "Prospect employees are dispatched in time to meet the passenger's request")). Likewise, for a passenger leaving the Airport via Michigan Flyer, Prospect will take the passenger to the bus stop location or, at the passenger's request, return at the requested time to provide assistance to the bus stop to coincide with Michigan Flyer's scheduled pick-up time. (*Id.*, ¶ 6 (stating "If a passenger wishes to wait in the waiting area of the GTC, he or she can make a request to the Prospect employee that Prospect return at a set time for further assistance")). The new bus stop options are simply one *additional* accommodation that the Airport Authority is pre-emptively making available for passengers using all ground transportation services.

*WCAA Response to Plaintiffs' Supp. Memo.*, ECF No. 44 at 3-4.

Plaintiffs say that if the WCAA allows anyone who requests the accommodation to use the New Stops, then they should allow all passengers to use them.

11

The fact that the WCAA does not screen individuals who request the service does not matter. Anyone can get on and off at the New Stops, a benefit which contradicts Plaintiffs' argument that intercity public transportation is segregated.

A review of the regulations referenced by Plaintiffs demonstrates that they have not proffered enough legal or factual support to justify the extraordinary remedy of injunctive relief at this stage of the litigation. Plaintiffs cite regulations which do not support their claims of inaccessibility and segregation. If there is no ADAAG (Americans with Disabilities Act Accessibility Guidelines) ". . . standard governing what plaintiffs seek, then plaintiffs cannot sustain a claim of discrimination based on the facility." *Thomas v. Northwest Airlines Corp.*, 2011 U.S. Dist. LEXIS 91149, *4 (E.D. Mich. Aug. 16, 2011).

In conclusion, the New Stops under the Regulations are additional, not segregated, accommodations that the WCAA is now making available to all passengers, including the disabled, who use ground transportation services. Plaintiffs are not likely to prevail on a claim that Defendants violate the ADA and the Rehabilitation Act by providing New Stops as configured in the Regulations.

### 2. THE REHABILITATION ACT AND THE ADA DO NOT REQUIRE DEFENDANTS TO PROVIDE EITHER THE SHORTEST ACCESSIBLE ROUTE OR PREFERENTIAL TREATMENT TO ANY INTERCITY PUBLIC TRANSPORTATION PROVIDER

Throughout their Complaint, Plaintiffs argue entitlement to the "shortest accessible route." The Court agrees with WCAA that Plaintiffs now seem to abandon that argument. Additionally, nowhere in their Emergency Motion do Plaintiffs support or argue their underlying litigation theme: that they are entitled to the shortest accessible

12

route.  The Court believes what is really at play here is a more narrowed accessible route argument: that Michigan Flyer, on whose behalf Plaintiffs argue, is trying to get preferential access at DTW for its passengers.

In requesting this extraordinary injunctive remedy, Plaintiffs have an obligation to demonstrate they will prevail on the merits of their litigation.  Yet, they woefully fail to support their claims.  "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones."  *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997).

During the TRO hearing, Plaintiffs' counsel was asked to respond to the suggestion by WCAA counsel that Michigan Flyer is trying to get superior treatment for its disabled passengers even though individuals with disabilities come to the airport by all means of transportation. Plaintiffs' counsel responded: "Your honor, [WCAA counsel] is 100% correct.  Michigan Flyer is intercity bus. It's the only form of intercity bus along with AirRide and the Congress of the United States, not these Plaintiffs, have provided a superior right of access."  Tr. 3/15/16 Hr.'g at 38, ECF No. 40-12.

The Court is concerned that its resources are now being used to re-litigate matters already disposed of in *Lawson I*.

WCAA asserts that Michigan Flyer has been working in conjunction with both former and current parties in interest. The record bears this out. As early as 2007, Indian Trails (an affiliate of Michigan Flyer) filed a complaint with the Federal Aviation Authority ("FAA") in opposition to WCAA's ability to change the pick-up and drop-off locations. The FAA ruled against them. Named plaintiffs, with the support of Michigan

13

Flyer, tried again in 2014 by filing suit in Federal Court, the *Lawson I* case. The Settlement Agreement mentioned earlier was entered by the parties at that time. Apparently Michigan Flyer decided it did not care for those terms (Mr. Turkish called the Settlement in the *Lawson I* "a mistake"). Michigan Flyer has its hands in the case now before the Court, as demonstrated by its recently filed Motion to Intervene.

Michigan Flyer's Motion to Intervene cites to the Settlement Agreement in *Lawson I* as if it were a party, claims that it was retaliated against because of its support for the Settlement Agreement, and claims that it was sued because it carried out the terms of the Settlement Agreement. A review of the Settlement Agreement shows that Michigan Flyer, AirRide and SMART are "Eligible Transportation Providers" and that the "individual" plaintiffs filed the lawsuit against WCAA seeking to prevent the relocation of the bus stop from International Arrivals to the GTC.

Michigan Flyer filed *Lawson II* in 2015. In *Lawson II*, the court described the relationship between Michigan Flyer and the plaintiffs as quite involved. "Michigan Flyer and Indian Trails played a role in assisting the plaintiffs in that case (*Lawson I*), which included preparing affidavits and giving testimony that the plaintiffs relied upon in support of their position that the Airport flouted the ADA's requirements in constructing and operating its GTC." *Michigan Flyer, LLC v. Wayne Cty. Airport Auth.*, No. 15-11512, 2015 WL 5836052, at *1.

This level of involvement not only in the 2014 and 2015 cases, but also in the current suit is notable. Longstanding doctrines of *res judicata* and *collateral estoppel*, including non-mutual *collateral estoppel*, are designed to bring finality to disputes and prevent needless consumption of judicial resources; these doctrines form part of the

14

core foundation on which our common law system rests.

A pattern is emerging. What appears to be happening is an attempt by Michigan Flyer, through various organizations representing disabled people and named individual plaintiffs, to play a game of "heads I win, tails you lose."

At base, it is clear that Michigan Flyer has been an active contributor at every stage of litigation against WCAA whether it has been named or not. It has been on notice of the proceedings, participated in advocacy, and defended its interests.

"The Sixth Circuit has found a nonparty to be 'in privity, or sufficiently close to a party in the prior suit so as to justify preclusion,' in the following three situations: (1) a non-party who has succeeded to a party's interest in property is bound by any prior judgments against the party; (2) a non-party who controlled the original suit will be bound by the resulting judgment; and (3) federal courts will bind a non-party whose interests were represented adequately by a party in the original suit. *In re Air Crash at Detroit Metro. Airport, Detroit, Mich.*, on Aug. 16, 1987, 976 F. Supp. 1076, 1079 (E.D. Mich. 1997), (quoting *Becherer v. Merrill Lynch, Pierce, Fenner & Smith,* 43 F.3d 1054, 1069–70 (6th Cir. 1995), *cert. denied sub. nom. Adams v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,* 516 U.S. 912 (1995) (quoting *Southwest Airlines Co. v. Texas Int'l Airlines,* 546 F.2d 84, 95 (5th Cir. 1977).

The first situation does not apply here, but the second and third might. With regard to the third situation, the Sixth Circuit held that the doctrine of adequate representation -- also known as virtual representation -- requires more than a showing of parallel interest or, even, a use of the same attorney in both suits. *Id.* Virtual representation is a question of fact and is to be kept within "strict confines." *Id.* It

15

"demands the existence of an express or implied legal relationship in which parties to the first suit are accountable to non-parties who file a subsequent suit raising identical issues." *Id.* (quoting *Becherer,* 43 F.3d at 1070).

> The Sixth Circuit does not follow strict confines with this doctrine:

> Some cases may present substantial elements of several different grounds of nonparty preclusion without clearly justifying application of any one ground. Careful application of the virtual representation label may provide a convenient means of aggregating these separate elements in special circumstances that make relitigation especially unattractive.... [c]lose nonlitigating relationships with a party, participation, apparent acquiescence, and perhaps deliberate maneuvering to avoid the effects of the first action are among the factors to be weighed.

*Id.* (quoting *Becherer*, 43 F.3d at 1070 (quoting 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4457 (1981).

Although this issue of potential privity between these Plaintiffs and Michigan Flyer has not been litigated and briefed by Plaintiffs and Defendants, the Court has certainly been very mindful that the "shortest accessible route" issue was front and center in *Lawson I*, resulting in substantial agreement over issues that Plaintiffs' counsel here says was a mistake, and which Plaintiffs – again with the assistance of Michigan Flyer -- now seek to undo.

On the merits, Plaintiffs fail to substantiate they have a legal right to the shortest accessible route or to a preferred route for the benefit of Michigan Flyer.

## B.    Other TRO Factors

### 1.    Irreparable harm

Plaintiffs contend they will suffer irreparable harm because they will have to reveal their disability to third-party transportation providers, and in doing so will suffer

humiliation and stigmatization.  As discussed above, however, Plaintiffs need make no such disclosure. While it is true that emotional and psychological damage can be sufficient to justify a preliminary injunction, *Sunrise Dev., Inc. v. Town of Huntington, New York*, 62 F.Supp. 2d 762, 778 (E.D.N.Y. 1999) and *Caspar v. Snyder*, 77 F. Supp. 3d 616, 641 (E.D. Mich. 2015), the only thing that Plaintiffs say will cause them such damage is simply not contemplated under the Regulations.

Plaintiffs' second argument fares no better.  They say transportation providers will be unable to comply with the new Regulations and Plaintiffs will face unreasonable delays, including missed flights and unreasonable wait times. In support, Plaintiffs rely on the affidavit of Chad Cushman, the Vice President of Michigan Flyer.  According to Mr. Cushman, Michigan Flyer cannot service these extra stops and maintain its schedule. Plaintiffs argue these "incidental harms" cannot be compensated with money damages and are therefore, irreparable.

Plaintiffs must show more than a mere "possibility" of irreparable harm.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.").  "The potential harm must be actual and imminent, and not merely remote or speculative." *The Romantics v. Activision Pub., Inc.*, 532 F. Supp. 2d 884, 890 (E.D. Mich. 2008) ) (citations omitted) (no irreparable injury where Plaintiffs failed to show monetary damages would be insufficient).  Plaintiffs must demonstrate that irreparable injury is likely in the absence of an injunction.  *Winter*, 555 U.S. at 22.

17

The Court concludes that Plaintiffs have not made a sufficient showing of irreparable harm. Under the Regulations, the drivers will announce the stops. Plaintiffs will not have to identify themselves as people with disabilities. Additionally, Mr. Cushman's conclusory assertion that his company will not be able to maintain its schedule fails to demonstrate irreparable harm.

### 2.     Substantial Harm to Others and Public Interest

Plaintiffs say even if Defendants have to make adjustments to accommodate them, this is minor compared to the exclusion and stigmatization faced by Plaintiffs. Plaintiffs also say a TRO will advance the public interest by enforcing federal law. Delta addresses the factors in conclusory fashion only; WCAA does not address either factor.

The Court need not discuss all four TRO factors if one or two are dispositive. *Brock v. Cox*, No. 09-310, 2009 WL 1456472, at *3 (W.D. Mich. May 22, 2009); *Edwards v. Burnett*, 2006 WL 1983236, *2 (E.D.Mich. July 12, 2006).

Plaintiffs have not shown a strong likelihood of success on the merits or irreparable injury. Accordingly, the Court declines to discuss these two factors.

### C.     Claims against Delta Fail

Delta says it has nothing to do with the allegations made by Plaintiffs. It says it did not propose nor does it have the power to implement regulations at DTW.

Plaintiffs fail to develop their arguments against Delta. Although Plaintiffs at times make plural references to "Defendants," all of their arguments for a TRO pertain to WCAA. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to

18

mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997).

Delta says it does not have the power to take corrective action.

The Court denies any requested relief against Delta.

## IV.    Conclusion

Plaintiffs' Motion for a Temporary Restraining Order and/or Preliminary Injunction is **DENIED**.

**IT IS ORDERED**.

s/Victoria A. Roberts                        
Victoria A. Roberts
United States District Judge

Dated:  April 1, 2016

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on April 1, 2016.

s/Linda Vertriest
Deputy Clerk