UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DONNA ROSE and PAUL PALMER,

               Plaintiffs,                             Case Number 15-13567

v.                                               Honorable David M. Lawson

WAYNE COUNTY AIRPORT AUTHORITY,

               Defendant.

_____/

**OPINION AND ORDER GRANTING IN PART MOTION TO
DISMISS, DENYING MOTIONS FOR RECONSIDERATION OF DENIAL
OF TEMPORARY RESTRAINING ORDER, LEAVE TO AMEND COMPLAINT,
AND INTERVENTION, AND DISMISSING CASE AS MOOT**

This complaint in this case is the third filed by plaintiffs' counsel on behalf of clients expressing concern about accessability to the Detroit Metropolitan Airport's McNamara Terminal by individuals with disabilities arriving via public transportation. The focus of this case, as with the others, is on pickup and drop-off locations within and outside the Ground Transportation Center (GTC) and whether the defendant Airport Authority is complying with the mandate of the Americans with Disabilities Act (and its Michigan counterpart), which prohibits "discriminat[ion] against [an individual] on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation," 42 U.S.C. § 12182(a), and also prohibits exclusion from and discrimination against such individuals regarding "the services, programs, or activities of a public entity," *id.* § 12132. The complaint identifies claims based on ADA Title II, Part A and implementing regulations (prohibiting discrimination on the basis of disability), ADA Title II, Part B (prohibiting discrimination in public transportation), ADA Title V (prohibiting coercion or intimidation of disabled persons), the Rehabilitation Act of 1973 (prohibiting discrimination by programs receiving

federal funds), the Michigan Persons With Disabilities Civil Rights Act (banning discrimination in public accommodations), and the Fourteenth Amendment's Equal Protection Clause.

The complaint, filed on October 12, 2015, is based on the premise that the area within the GTC designated by the Airport Authority for pickup and drop-off by public transportation busses is inaccessible by persons with disabilities because it is located at "the farthest possible . . . corner of the GTC," and those busses — operated by SMART, AirRide, Indian Trails, and Michigan Flyer — are primary carriers for disabled persons seeking to use the airport. The plaintiffs allege in the complaint that the Airport Authority permits other busses — shuttles, charter services, some private carriers — to load and unload at a stop immediately adjacent to the GTC's airport entrance door, known as "Door 402." The plaintiffs want the Airport Authority to allow public transportation providers to use that stop as well.

The Airport Authority responded to the complaint with a motion to dismiss, and the plaintiffs moved for a preliminary injunction. In early 2016, the Airport Authority enacted new regulations effective March 14, 2016, which required all GTC operators to announce that passengers with disabilities could be dropped off closer to the terminal upon request, and when such a request was made, the operator  must pick up and discharge the requester and companions at one of several "alternative stops." One of those stops is Door 402. The plaintiffs, unsatisfied with that accommodation, filed an emergency motion for a temporary restraining order (TRO) to prevent the new regulations from taking effect. That motion was denied by another judge of this Court before the case was transferred to the undersigned. Thereafter, public transportation provider Michigan Flyer filed a motion to intervene, and the plaintiffs filed a motion for reconsideration of the denial

of the TRO. The plaintiffs also filed a motion to amend their complaint to attack the new regulations and assert other theories under the ADA.

Shortly before oral argument, the plaintiffs withdrew their motion for preliminary injunction. On September 1, 2016, the Court heard oral argument on the defendant's motion to dismiss, the plaintiffs' motions for leave to file an amended complaint and reconsideration of the order denying the TRO, and non-party Michigan Flyer's motion to intervene. Although the complaint contains several nonmeritorious counts, it does plead a viable claim under Title II of the ADA, because the plaintiffs have stated facts that establish that they requested a reasonable accommodation to the functional operations of the GTC, which had not been allowed by the Airport Authority at the time the complaint was filed. But subsequent developments establish that the Airport Authority has granted a reasonable accommodation, which complies with the ADA, and that change in circumstances renders the plaintiffs' claims moot. The Court, therefore, will dismiss the complaint and deny the motions for reconsideration, to amend the complaint, and for Michigan Flyer's intervention. The Court will dismiss the case as moot.

## I. Facts

Some history is in order. Before 2014, public transportation busses that transported disabled travelers and others dropped off and picked up passengers near the international arrivals door, which leads directly into the McNamara Terminal proper. In September of that year, the Airport Authority moved the bus pickup and drop-off point to the GTC, which is an area across a roadway from the terminal. The roadway is traversed by a pedestrian bridge, but the access point for the bridge is inside the GTC's enclosed lobby. The Airport Authority made the change, it said, because of congestion and safety concerns.

A.  First Lawsuit

In response to the proposed change, plaintiffs' counsel filed a lawsuit in September 2014 on behalf of Michael Harris and Karla Hudson against the Airport Authority alleging ADA violations. Public transportation providers Michigan Flyer and Indian Trails played a role in assisting the plaintiffs in that case, which included preparing affidavits and giving testimony that the plaintiffs relied upon in support of their position that the Airport Authority flouted the ADA's requirements in constructing and operating its GTC. That case was dismissed after the parties — including Harris, Hudson, the Airport Authority, and non-party Michigan Flyer — entered into a settlement agreement that called for certain changes to be made to the construction and operation of the GTC facility. After some protracted litigation over disputes about the Airport Authotity's specific performance obligations under the settlement agreement, the parties finally reached a mutually agreed — though apparently not entirely conciliatory — resolution of their controversy. One feature of the settlement agreement called for establishing dedicated spots in the GTC where Michigan Flyer and Indian Trails could pick up and discharge their passengers. The agreed location of those spots was approximately 600 feet from Door 402.

B.  Second Lawsuit

In April 2015, plaintiffs' counsel filed a second lawsuit against the Airport Authority over the location of the bus stops and the carriers' access to them, this time on behalf of Michigan Flyer and Indian Trails. Those plaintiffs alleged that, immediately after the settlement agreement in the *Harris* case was executed, the Airport Authority carried out a number of retaliatory gestures toward them, including unilaterally reducing the amount of time that the companies' busses could stop at the GTC to load and unload passengers; forcing their drivers to circle the airport instead of stopping

in their assigned spaces, even when spaces were available; and forcing their drivers to vacate assigned spaces before their scheduled departure times, even when no other vehicles were waiting to use the spaces.   The companies also asserted that the Airport Authority brought frivolous misdemeanor charges against them in state court, based on tickets issued to them for purportedly "prohibited signage" displayed at a desk used by their employees in the GTC lobby.   On October 7, 2015, the Court dismissed the case after concluding that the antiretaliation protections of the ADA apply only to "individuals," a term that has come to refer to natural persons, not artificial entities such as Michigan Flyer, LLC.   The Court subsequently denied the plaintiffs' motion for reconsideration and the Airport Authority's motion for attorney fees.   Michigan Flyer appealed the dismissal, and that appeal remains pending.

### C.  Present Case

Five days after the Court dismissed Michigan Flyer's retaliation complaint, plaintiffs' counsel filed this case on behalf of Paul Palmer and Donna Rose.   Palmer and Rose allege that certain conditions at the GTC make it inhospitable and inaccessible to them and violate the ADA. The pickup and drop-off location they criticize is the bus stop situated about 600 feet from the Door 402 entrance to the sheltered area of the GTC — the location approved by the parties in the *Harris* case settlement.   The plaintiffs say that shortly after the settlement in the *Harris* case was executed, the Airport Authority made an operational change at the GTC and started allowing certain transportation providers — but not Michigan Flyer or Indian Trails — to use a pickup and drop-off spot immediately outside Door 402.   The plaintiffs contend that their preferred providers also should be allowed to use that location, because, due to the Airport Authority's change in policy, that location now is the "shortest accessible route" from the outside embarkation point to the more

-5-

accommodating and sheltered indoor waiting area in the GTC lobby.  In their original complaint, the plaintiffs also named Delta Airlines, Inc. as a defendant, but they subsequently stipulated to dismiss all of their claims against Delta, which were brought under Title III of the ADA.

According to the original complaint, Paul Palmer, who lives in Lansing, Michigan, struggles with cerebral palsy and is wheelchair-bound.  His condition also causes breathing and communications difficulties.  He contends that he cannot access the Detroit Metropolitan Airport via public transportation because the drop-off location is located at an "extreme distance [from] the terminal proper," and the fumes in the GTC exacerbate his breathing problems.  Donna Rose, who is totally blind, alleges that she cannot access the airport safely from the current public bus drop-off location because the "constant noise" in the GTC's outdoor area limits Rose's ability to use her sense of hearing, which is essential for a blind person to travel safely.  Also, in the winter months, the frigid temperatures in the GTC are intolerable for her.

The parties do not appear to dispute that Palmer and Rose qualify as disabled individuals under the relevant federal and state laws and regulations.  The Airport Authority has questioned the proportion of Michigan Flyer's overall ridership that is disabled, but the defendant does not seriously contest the plaintiffs' assertions that they, and at least some other disabled persons who are similarly situated, "rely on public transportation services as their sole means of transportation when traveling to and from" the Detroit Metropolitan Airport.

The plaintiffs state that the 2014 relocation of the public transportation loading location from the international arrivals area caused SMART's, AirRide's, and Michigan Flyer's drop-off points to be moved "to the farthest possible and [most] inaccessible corner" of the GTC.   The plaintiffs

point out that other bus services, including Great Lakes Bus, and the Airport and Delta Employee Shuttle, continue to use the international arrivals location.

The plaintiffs contend that the prior international arrivals drop-off location complied with the ADA because "it minimized the distance Plaintiffs, and others similarly situated, would have to travel to reach the terminal, and Defendant has demonstrated, through its own actions, that integrated alternatives that provide a similar level of accessibility are available at this public airport." The plaintiffs assert that, since the relocation, and after the settlement in the *Harris* case was concluded, the Airport Authority "has consistently allowed" other transport providers to discharge and pick up passengers directly outside Door 402, but not the plaintiffs' preferred public transportation providers, demonstrating that the spot is no longer a no-parking area, and it is "the shortest accessible route" to the GTC lobby and "most proximate to the Terminal Proper."

The plaintiffs allege that the boarding location at the "extreme end" of the GTC violates several provisions of the ADA Accessibility Guidelines (ADAAG) — the regulations enacted by the Attorney General that govern the "design, construction, and alteration" of public buildings.' *See* 28 C.F.R. Pt. 36 App. A, § 1. They point to section 4.6.2 of the Guidelines, which states that parking spaces "that serve a particular building shall be located on the shortest accessible route from parking to an [accessible entrance]." They also cite section 10.4.1, which states, with regard to new construction of airports, that "[e]lements such as ramps, elevators or other vertical circulation devices, ticketing areas, security checkpoints, or passenger waiting areas shall be placed to minimize the distance which wheelchair users and other persons who cannot negotiate steps may have to travel compared to the general public." The plaintiffs contend that the present GTC boarding location for Michigan Flyer and Indian Trails busses violates section 10.4.1 because it forces the plaintiffs to

travel the greatest — not shortest — distance possible to reach the GTC lobby. They state in their complaint that the old discharge area at the international arrivals curb complied with section 10.4.1, and they concede that "Door 402 would be similarly compliant." Compl. ¶¶ 50-53.

The plaintiffs also allege that the Airport Authority's refusal to adopt a more suitable boarding location for public transportation violates several federal regulations enacted to guide compliance with the ADA. For one, they say that under 28 C.F.R. § 35.150(a), "[a]n airport operator must ensure that its services, programs, or activities are accessible to persons with disabilities." The plaintiffs contend that the Airport Authority has failed to "make reasonable modifications to its policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability," and that the Airport Authority's intransigence is unjustified because it has not "demonstrate[d] that the modifications would fundamentally alter the nature of the service, program, or activity." The plaintiffs also allege that, under 28 C.F.R. §35.150(b), "[e]xisting facilities must be accessible to and usable by individuals with disabilities," and "[p]ublic entities must give priority to those methods that provide services, programs, and activities in the most integrated setting appropriate for persons with disabilities." The plaintiffs charge that the Airport Authority has "failed to provide access to qualified persons with disabilities in the 'most integrated setting,' instead forcing them to the most segregated and inaccessible corner of their Airport in violation of 28 C.F.R. § 35.130(d)." Compl. ¶ 54.

The plaintiffs also allege that the Airport Authority has discriminated against them in violation of the ADA by locating the public transportation bus loading area at the far south end of the GTC, because it forces disabled persons to use an inaccessible area, thereby denying them equal access to the airport facility. The complaint charges that the changes made by the Airport Authority

-8-

have caused the Detroit Metropolitan Airport "to be effectively inaccessible to public transportation riders, a service disproportionately relied on by Plaintiffs, and others similarly situated," and the Airport Authority has "failed to operate [its] Ground Transportation facilities in a way that promotes accessibility to Plaintiffs, and others similarly situated."  Compl. ¶¶ 55-56.  However, they assert that a "boarding location immediately outside of Door 402, which has now been used as an alternative boarding location for Charter Busses and Shuttles and regularly used for U of M Airbus, when viewed in the entirety, would make the GTC readily accessible to disabled public transportation users."  Compl. ¶ 65.

In their original prayer for relief the plaintiffs asked the Court to issue an "injunction preventing Defendants from continuing to use the farthest end of the Ground Transportation Center as a boarding location for public transportation, and ordering Defendants to allow public transportation providers to board immediately outside of Door 402, the location with the shortest accessible route within the GTC, or a similar accessible location, such as the employee bus stop at International Arrivals, the Charter Bus unloading zone on the Departures Level, or outside Door 5 of the Arrivals Level, which is frequently used for Charter Buses."  Compl. ¶ 101.

### D.  New Airport Regulations

After this lawsuit was filed, the Airport Authority issued new regulations governing the use of the GTC and other terminal boarding locations by all transportation providers.  After publication and a period of public comment, the new regulations were to take effect on April 1, 2016.  The plaintiffs filed an emergency motion for a preliminary injunction seeking an order to halt the issuance of those regulations, which the Court denied on April 1, 2016.  The new regulations went into effect on April 4, 2016.

-9-

The new rules require all "Ground Transportation Operators" to "provide an additional pick-up or drop-off option" when receiving a "request for accommodation from an individual with a disability."  Def.'s Notice of New Regulations [dkt. #39], Ex. 1, WCAA Ground Transportation Regulations § 13(D) (Pg ID 1683-84).  Under the new rules, when a bus enters the airport heading toward the McNamara Terminal, the driver must announce: "Passengers with a disability or needing extra time or assistance may remain onboard with their travel companions and be dropped off closer to the terminal."  The driver then must drop off his or her passengers at the usual designated location.   If any remain on board, he then must proceed to the departure level curb to drop of the remaining riders.  For pickups, when receiving a request, the driver would stop at Door 402 outside the GTC lobby.

The regulations prohibit any ground transportation provider from using the alternate stops allowed under the regulations absent a passenger request.  However, they also prohibit any operator from asking whether a requesting passenger is disabled or asking the requester to verify or describe the nature of their disability.

The regulations apply to all bus operators, public transportation corporations, and all other private transportation services.

### E.  Proposed Amended Complaint

After the Airport Authority enacted the new regulations, the plaintiffs filed their motion for leave to file an amended complaint.  The proposed amended complaint would add allegations to Counts I and II brought under ADA Title II attacking the new regulations as "unnecessarily segregat[ing the p]laintiffs," thereby "causing stigmatization, humiliation, and embarrassment by providing an accessible bus stop only to individuals with disabilities, only where an individual with

a disability affirmatively requests use of the separate bus stops, and only upon full cooperation of third-party transportation providers." Proposed Am. Compl. ¶ 60. The plaintiffs also would allege that 28 C.F.R. § 35.130(b)(1)(iv) prohibits public entities from providing separate accommodations, unless doing so "is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others." The plaintiffs contend that using separate bus stops for disabled individuals violates the ADA's "integration mandate," because the Airport Authority cannot demonstrate the absence of an integrated alternative, for example, returning to the use of the international arrivals area as a loading location or full-time use of the Door 402 spot.

In their enhanced Count IV, the plaintiffs would allege that "providing segregated access for individuals with disabilities" targets the plaintiffs and shows "discriminatory animus" toward them as public transportation users.

In Counts V and VI (discrimination by programs receiving federal funds, and discrimination in public accommodations (state law)), the plaintiffs would add allegations that the Airport violates the salient federal and state laws "by operating an inaccessible public bus stop, and by providing accessible access only through the provision of separate accommodations," Proposed Am. Compl. ¶ 91 (Count V), and "[t]hrough the operation of an inaccessible bus stop, and the provision of segregated services for individuals with disabilities," *id.* ¶ 98 (Count VI).

In their amended Count VII, the plaintiffs would allege that the "Defendant treats Plaintiffs, and those similarly situated, as second-class citizens, effectively relegating them to the farthest corner of DTW, and only providing accessible service through the provision of segregated accommodations." Proposed Am. Compl. ¶¶ 102-03.

-11-

In their amended prayer for relief, the plaintiffs seek an injunction that prevents the use of the GTC stops that are presently designated for Michigan Flyer and Indian Trails and requires the Airport Authority to allow those carriers to use the locations outside Door 402 or the international arrivals area.

## II. Motion to Dismiss

The Airport Authority argues that the complaint should be dismissed because (1) no applicable provision of the ADAAG requires that a public bus stop be located on the "shortest accessible route" to the terminal entrance, and the provisions of the guidelines that the plaintiffs cite govern the location of parking spaces provided for "self-parking," not bus stops; (2) the plaintiffs have not alleged that any of the Airport's decisions about ground transportation at its facilities were directed at them because of their disabilities; and (3) the plaintiffs have not alleged any facts to show that they are treated differently than other travelers at the airport due to their disabilities.

The plaintiffs respond that (1) they rely upon the "shortest accessible route" directive, and cited a "myriad of other regulations" to show that the ADA and its pendent regulations "promote a common theme — minimizing the distance persons with disabilities must travel to access facilities"; (2) the current location of the public transit stop in the GTC is at the most remote location available from the terminal entrance, which maximizes the distance that public transit users must travel compared to other travelers at the airport; and (3) public transit is a service that disabled riders disproportionately rely upon relative to other forms of ground transportation such as taxis and shuttles, and, thus, the defendant's situation of the public transit stop disproportionately affects disabled travelers compared with the general public. The plaintiffs also contend that they adequately pleaded facts to show that the Airport's decisions have been motivated by hostility toward disabled

passengers, because they allege that the defendant "ignored" a crescendo of public and private outcry urging that the move of the public bus stop to the GTC "would be harmful to the disabled," and, immediately after the settlement in the *Harris* case was concluded, the Airport Authority "took steps to undermine accessibility" at the airport. Finally, the plaintiffs argue that they adequately have pleaded that public transit riders are treated differently than travelers arriving at the airport by other forms of ground transportation, and the Airport Authority has failed to offer any justification for that disparate treatment other than an apparent economic motive to favor forms of transportation that supply the defendant with more revenue (e.g., parking fees).

The Airport Authority's motion is brought under Federal Rule of Civil Procedure 12(b)(6). "The purpose of Rule 12(b)(6) is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief if all the facts and allegations in the complaint are taken as true." *Rippy ex rel. Rippy v. Hattaway*, 270 F.3d 416, 419 (6th Cir. 2001) (citing *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993)). Under Rule 12(b)(6), the complaint is viewed in the light most favorable to the plaintiff, the allegations in the complaint are accepted as true, and all reasonable inferences are drawn in favor of the plaintiff. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). "However, while liberal, this standard of review does require more than the bare assertion of legal conclusions." *Columbia Nat'l Res., Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995); *Tackett v. M & G Polymers, USA, L.L.C.*, 561 F.3d 478, 488 (6th Cir. 2009). "To survive a motion to dismiss, [a plaintiff] must plead 'enough factual matter' that, when taken as true, 'state[s] a claim to relief that is plausible on its face.' *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007). Plausibility requires showing more than the 'sheer possibility' of relief but less than a 'probab[le]' entitlement to relief. *Ashcroft v. Iqbal*, [556 U.S. 662, 678] (2009)." *Fabian v.*

-13-

*Fulmer Helmets, Inc.*, 628 F.3d 278, 280 (6th Cir. 2010). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

Under the new regime ushered in by *Twombly* and *Iqbal*, pleaded facts must be accepted by the reviewing court, but conclusions may not be accepted unless they are plausibly supported by the pleaded facts. "[B]are assertions," such as those that "amount to nothing more than a 'formulaic recitation of the elements'" of a claim, can provide context to the factual allegations, but are insufficient to state a claim for relief and must be disregarded. *Iqbal*, 556 U.S. at 681 (quoting *Twombly*, 550 U.S. at 555). However, as long as a court can "'draw the reasonable inference that the defendant is liable for the misconduct alleged,' a plaintiff's claims must survive a motion to dismiss." *Fabian*, 628 F.3d at 281 (quoting *Iqbal*, 556 U.S. at 678).

### A. Intentional Discrimination and Retaliation

"ADA Title II provides that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.'" *Babcock v. Michigan*, 812 F.3d 531, 535 (6th Cir. 2016) (quoting 42 U.S.C. § 12132). "'Public entity' includes 'any state or local government' and 'any department, agency, special purpose district, or other instrumentality of a State or States or local government.'" *Ability Center of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 904 (6th Cir. 2004) (quoting 42 U.S.C. § 12131(1)(A) & (B)). Similarly, under the Rehabilitation Act of 1973, "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial

-14-

assistance." 29 U.S.C. § 794(a). The regulations enacted under the authority of the Rehabilitation

Act require airport operators that receive federal funds to comply with Title II of the ADA. 49

C.F.R. § 27.71(b). Title II of the ADA tracks the protections of the Rehabilitation Act, and therefore

analysis of claims under both "roughly parallels" each other, "because the statutes contain similar

language and are 'quite similar in purpose and scope.'" *Babcock*, 812 F.3d at 540 (quoting

*McPherson v. Michigan High School Athletic Association, Inc.*, 119 F.3d 453, 459-60 (6th Cir.

1997)). The same can be said for claims under Michigan's Persons With Disabilities Civil Rights

Act, Mich. Comp. Laws § 37.1102(1), which "substantially mirrors the ADA." *Donald v. Sybra,*

*Inc.*, 667 F.3d 757, 764 (6th Cir. 2012) (quoting *Cotter v. Ajilon Servs., Inc.*, 287 F.3d 593, 597 (6th

Cir. 2002)).

In addition, section 503(b) of Title V of the ADA makes it "unlawful to coerce, intimidate,

threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her

having exercised or enjoyed, or on account of his or her having aided or encouraged any other

individual in the exercise or enjoyment of, any right granted or protected by this chapter." 42 U.S.C.

§ 12203(b). Section 12203 is entitled: "Prohibition against retaliation and coercion," and it also

contains subsection (a), which explicitly protects complainants who file formal or informal

grievances or participate in litigation over alleged unlawful practices from retaliation prompted by

those efforts to enforce their rights. *See* 42 U.S.C. § 12203(a) ("No person shall discriminate against

any individual because such individual has opposed any act or practice made unlawful by this

chapter or because such individual made a charge, testified, assisted, or participated in any manner

in an investigation, proceeding, or hearing under this chapter.").

One point made clear by the pleadings is that this is not a case about intentional discrimination, and it is not a case about retaliation. It is a case about accessibility. In their pleadings and briefing the plaintiffs allude to "animus" and attempt to advance the theory that the Airport intentionally discriminates against disabled travelers by "[treating them] as second-class citizens [and] effectively relegating them to the farthest corner of DTW." However, there are no facts alleged anywhere in the complaint, or evident anywhere in the record, that plausibly could sustain any intentional discrimination or retaliation claim.

"To establish a *prima facie* case of intentional discrimination under Title II of the ADA, a plaintiff must show that: (1) she has a disability; (2) she is otherwise qualified; and (3) she was being excluded from participation in, denied the benefits of, or subjected to discrimination under [a public program] because of her disability." *Anderson v. City of Blue Ash*, 798 F.3d 338, 357 (6th Cir. 2015). "In other words, the plaintiff must show that the defendant took action because of the plaintiff's disability, i.e., the '[p]laintiff must present evidence that animus against the protected group was a significant factor in the position taken by the municipal decision-makers.'" *Ibid.* (quoting *Turner v. City of Englewood*, 195 F. App'x 346, 353 (6th Cir. 2006)). "Further, the plaintiff must show that the discrimination was intentionally directed toward him or her in particular.'" *Ibid.* (quoting *Tucker v. Tennessee*, 539 F.3d 526, 532 (6th Cir. 2008)).

The plaintiffs have not alleged any facts that plausibly could support an inference that the Airport Authority made any decision relating to the situation of ground transportation at its facilities *because the plaintiffs are disabled*, or that any of its challenged conduct was directed deliberately at disabled travelers. Instead, the facts alleged in the complaint and amended complaint plausibly could be read to suggest, at most, that the airport has failed in certain respects to maintain its

-16-

facilities in an accessible condition as required by the directives of the ADA and its associated regulations. Those allegations are insufficient as a matter of law to sustain any claim for intentional disability-based discrimination under the ADA. *Anderson*, 798 F.3d at 359-60 ("Even if the City's procedures for compliance with federal regulations had a negative impact on its disabled citizens generally, this does not support the inference that the City's actions were motivated by C.A.'s disability because '[a]cts and omissions which have a disparate impact on disabled persons in general are not specific acts of intentional discrimination against the plaintiff in particular.'" (quoting *Dillery v. City of Sandusky*, 398 F.3d at 568 (6th Cir. 2005)).

The plaintiffs here have not alleged any facts to show that the Airport Authority's decisions to move the public transit boarding spot or to enact its new regulations concerning the alternative stops were in any way directed at them individually, or at disabled travelers generally. They allege that disabled passengers "disproportionately rely" on the services of Michigan Flyer. But that fact, even if true, does not establish, or even suggest, that disabled passengers are a disproportionate segment of the population affected by the relocation and the new regulations, as compared to all other passengers who use Michigan Flyer's service. The plaintiffs here have never alleged, and neither did the plaintiffs in the related proceedings before this Court, that Michigan Flyer exclusively services disabled riders, or even that its ridership is largely or mostly comprised of disabled persons. Nor does it appear that there is any set of facts on which they could do so. Michigan Flyer and its related entities operate busses that serve the general public on various routes and schedules between Ann Arbor, East Lansing, and the airport. *See* Michigan Flyer — About Us, http://www.michiganflyer.com/AboutUs.aspx ("Michigan Flyer-AirRide is Michigan's premier motorcoach service, offering 12 daily round trips between East Lansing, Ann Arbor, and Detroit

-17-

Metropolitan Airport, and an additional round trip between two Ann Arbor stops and DTW carries more than 100,000 passengers a year. A convenient, reliable service, Michigan Flyer-AirRide makes the trip for business travelers, families, students, and vacationers more relaxing and affordable."). Any effect that the Airport Authority's decisions had or will have on Michigan Flyer's customers affect all riders of its busses, disabled and non-disabled alike. Moreover, the Airport Authority's recently enacted regulations govern the usage of the GTC and other areas by all "ground transportation operators," which includes all public and private transportation services.

There is, simply put, nothing in the complaint, and no facts apparent from the record of the Airport Authority's conduct throughout these related litigations, that plausibly could support an inference that the Airport Authority made any of the challenged decisions or arrangements regarding public transportation at its facilities *because of* the plaintiffs' disabilities.

Following that same reasoning, the plaintiffs' claims for "coercion," "intimidation," and "interference" under 42 U.S.C. § 12203(b) suffer from the same deficiency. Whatever may be the scope of unlawful "interference" that is prohibited by section 12203(b), it is clear that a plaintiff who sues under that section must make out some viable claim that the defendant directly retaliated against him or her in response to an attempt to assert or exercise his or her rights under the ADA. "[T]o establish a *prima facie* case of retaliation, [the plaintiff must show] that (1) the plaintiff engaged in activity protected under the ADA; (2) the [defendant] knew of that activity; (3) the [defendant] took an adverse action against plaintiff; and (4) there was a causal connection between the protected activity and the adverse action." *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014). Here, the plaintiffs have alleged nothing more than that the Airport Authority maintained its facilities in an inaccessible condition. Nothing in the complaint establishes, or even suggests,

that the named plaintiffs made any effort to assert their rights to accessible facilities before the Airport Authority made its decisions, or that, if they did, the defendant was aware of such efforts, or that it made any of the challenged decisions in direct response to such protected conduct. "The ADA is not [] a catchall statute creating a cause of action for any [alleged] retaliation, but protects individuals only from retaliation for engaging in, or aiding another who engages in, activity covered by the ADA." *Rorrer*, 743 F.3d at 1046.

So far as they go, the allegations of the complaint suggest nothing more than that the defendant maintained its facilities in a condition that the plaintiffs regarded as inaccessible and non-compliant with the ADA. Those allegations are insufficient as a matter of law to sustain any cause of action sounding in retaliation. *Brown v. City of Tucson*, 336 F.3d 1181, 1193 (9th Cir. 2003) ("[T]he ADA's interference provision does not bar 'any action whatsoever that in any way hinders a member of a protected class.'"); *see also EEOC v. Luce, Forward, Hamilton & Scripps*, 303 F.3d 994, 1006 (9th Cir. 2002) (rejecting the agency's argument that the plaintiff's refusal to sign an arbitration agreement as a condition of employment "waiv[ing] his procedural right to file or litigate a civil suit was protected opposition conduct [under section 12203(b)]"). As the First Circuit explained in *Champagne v. Servistar Corp.*, 138 F.3d 7, 13-14 (1st Cir. 1998), in order to prevail on a section 12203(b) claim, the plaintiff must allege the elements of retaliation, including protected conduct, adverse action, and an unlawful response provoked by the protected conduct and directed individually at the plaintiff. The plaintiffs here have not alleged that they made any effort to assert their rights under the ADA before the Airport Authority made any of the challenged decisions regarding the situation of ground transportation at the McNamara Terminal. They do not offer any facts to show that the Airport Authority was aware of any such efforts, if they did make them. And

-19-

they have not alleged any facts plausibly to suggest that the challenged decisions were directed at them individually.  The Airport Authority's decisions concerning public ground transit at the McNamara Terminal affected all members of the general public who ride public busses, and nothing in the pleadings or the record plausibly suggests that any of the Airport Authority's decisions were in any way motivated by "animus" toward disabled travelers.

### B.  Accessibility Claims

Nevertheless, "Title II does more than prohibit public entities from intentionally discriminating against disabled individuals.  It also requires that public entities make reasonable accommodations for disabled individuals so as not to deprive them of meaningful access to the benefits of the services such entities provide."  *Ability Center*, 385 F.3d at 907.  The plaintiffs' claims must be analyzed under this second theory of Title II liability, which essentially requires a public entity strictly to comply with the ADAAG in the case of any new or altered construction, without regard to any subjective intent or motivation.  Under this "strict liability" component of Title II, a public entity must ensure that any new or altered facilities comply with the guidelines.  If they do not, then they must be modified to conform.  The Airport concedes that the McNamara Terminal is a new or altered facility subject to the requirements of the ADAAG (1991).

### 1.  Design Issues

"[Section 204 of the] Act grants the Attorney General authority to promulgate regulations to implement its provisions."  *Ability Center*, 385 F.3d at 904 (citing 42 U.S.C. § 12134).  "Pursuant to § 204, the Attorney General adopted 28 C.F.R. § 35.151, which provides that alterations of facilities commenced after January 26, 1992, 'by, on behalf of, or for the use of a public entity in a manner that affects or could affect the usability of the facility or part of the facility shall, to the

-20-

maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible and usable by individuals with disabilities.'" *Ibid.* (quoting 28 C.F.R. § 35.151(b)).

"Section 35.151 is part of a broader regulatory scheme that aims to effectuate § 202 of the ADA." *Ability Center*, 385 F.3d at 904. "The scheme makes explicit that 'no qualified individual with a disability shall, because a public entity's facilities are inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.'" *Ibid.* (quoting 28 C.F.R. § 35.149). "To be 'readily accessible,' any part of a newly constructed or altered facility must be constructed in conformance with the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities (ADAAG), 28 C.F.R. Pt. 36, App. A, or with the Uniform Federal Accessibility Standards (UFAS), 41 C.F.R. Pt. 101-19.6, App. A." *Daubert v. Lindsay Unified Sch. Dist.*, 760 F.3d 982, 986 (9th Cir. 2014) (citing 28 C.F.R. § 35.151(c)(1)-(3)). "The ADAAG is a comprehensive set of structural guidelines that articulates detailed design requirements to accommodate persons with disabilities." *Ibid.*

The ADAAG is found in Appendix A to Part 36 of Title 28 of the Code of Federal Regulations. The guidelines set forth several specifications that govern the location of parking spaces at any facility, and give specific guidance for the layout of bus stations and airports. Parking spaces are governed by sections 4.1 and 4.6 of the guidelines, which mandate that "[i]f parking spaces are provided for self-parking by employees or visitors, or both, then accessible spaces complying with 4.6 shall be provided in each such parking area in conformance with [the table of ratios] set forth [in the Guidelines]." ADAAG § 4.1.2(5)(a). The plaintiffs place heavy emphasis on section 4.6.2, which states that "[a]ccessible parking spaces serving a particular building [must]

-21-

be located on the shortest accessible route of travel from adjacent parking to an accessible entrance." ADAAG § 4.6.2.  Section 4.3 of the guidelines generally governs the layout of accessible routes from parking and transit stops to building entrances and mandates that "[a]t least one accessible route within the boundary of the site shall be provided from public transportation stops, accessible parking, and accessible passenger loading zones, and public streets or sidewalks to the accessible building entrance they serve.  The accessible route shall, to the maximum extent feasible, coincide with the route for the general public."  ADAAG § 4.3.2(a).

Section 10.3, discussed below, specifies some requirements for the routing of pedestrian traffic at "stations in [intercity bus] systems," and generally requires access routes to "coincide with the circulation path for the general public."  ADAAG § 10.3.1(1).  The guidelines also state that "[intercity bus stations] shall not be designed or constructed so as to require persons with disabilities to board or alight from a vehicle at a location other than one used by the general public."  ADAAG § 10.3.1(10).

Read most generously, the complaint fails to allege any facts that plausibly could sustain a claim that the McNamara Terminal facility was constructed or is maintained in violation of any applicable ADA Accessibility Guidelines or related regulations.  The plaintiffs contend that the space assigned to Michigan Flyer, which is 600 feet from Door 402 within the GTC, violates the ADAAG because it is not located on the "shortest accessible route" to the GTC entrance.  They have not pointed to any ADAAG provision that imposes such a requirement.  The plaintiffs rely on ADAAG § 4.1.2, but that provision explicitly governs only the location of "parking spaces [that] are *provided for self-parking by employees or visitors, or both*."  ADAAG § 4.1.2(5)(a) (emphasis added).  The pickup and drop-off spot assigned to Michigan Flyer's busses is not a "parking space"

-22-

provided for "self-parking by employees or visitors." The location of that embarkation point therefore is not subject to the requirement that "[a]ccessible parking spaces serving a particular building [must] be located on the shortest accessible route of travel from adjacent parking to an accessible entrance." ADAAG § 4.6.2. Instead, the location of the public bus stop in question is governed by section 4.3 of the guidelines, which mandates only that "*[a]t least one accessible route within the boundary of the site shall be provided from public transportation stops . . . to the accessible building entrance they serve,*" and that "[t]he accessible route shall, to the maximum extent feasible, *coincide with the route for the general public.*" ADAAG § 4.3.2(a). It is undisputed that there is at least one pedestrian route from the bus stop in question to Door 402 of the GTC, which the plaintiffs concede is a fully accessible entrance to the terminal. The plaintiffs have not identified any ADAAG-violating aspect of that route other than the distance between the stop and the door. They have not alleged that there is any variance between the path traveled by disabled passengers and the path taken by all other bus riders along that route. It is apparent from the exhibits included as part of the defendant's new regulations, and from the Court's own inspection of the facility during the *Harris* litigation, that the pedestrian route from the public transit bus stop in the GTC to Door 402 is identical for disabled travelers and all other bus riders. WCAA Ground Transportation Regulations Att. 10 (Pg ID 1697). In the absence of any other identified accessibility defect in that route, the guidelines require nothing more.

The location of the public transit stop also does not violate any of the other various ADAAG provisions or related regulations that the plaintiffs cite. Section 10.4 of the guidelines specifies some requirements for the routing of pedestrian traffic at airports. That section states: "Elements such as ramps, elevators or other vertical circulation devices, ticketing areas, security checkpoints,

or passenger waiting areas shall be placed to *minimize the distance which wheelchair users* and other

persons who cannot negotiate steps *may have to travel compared to the general public*," ADAAG

§ 10.4.1(1), and "*[t]he circulation path, including an accessible entrance and an accessible route*,

for persons with disabilities [must], to the maximum extent practicable, *coincide with the circulation*

*path for the general public*," ADAAG § 10.4.1(2) (emphases added); *see also* ADAAG 10.3.1(1)

(imposing similar requirements for passenger boarding locations at "intercity bus stations"). The

guidelines also state that "[intercity bus stations] shall not be designed or constructed so as to require

persons with disabilities to board or alight from a vehicle at a location other than one used by the

general public." ADAAG § 10.3.1(10). As noted above, the pickup and drop-off location is the

same for disabled travelers as it is for all other riders of Michigan Flyer's busses. It is undisputed

that the "circulation path" between the bus stop and Door 402 is identical for all public transit riders,

disabled and non-disabled alike. There is no mandate under the guidelines that requires the Airport

Authority to minimize the absolute distance from the bus stop to the terminal. The only requirement

under the applicable provisions is that any excursion taken by the "accessible route" away from the

route used by the general public be minimized. That requirement unquestionably is met where, as

here, the routes are one and the same.

The plaintiffs also allege that "noise" and "fumes" prevalent in the GTC facility aggravate

certain of their health conditions or hinder their ability safely to traverse the facility. Those issues,

however, are not ones within the ambit of the ADA or its associated regulations and guidelines.

They may be matters of real concern, and ones to which the Airport Authority prudently ought to

give consideration. But they do not aid in plausibly sustaining any accessibility claim under the

ADA. The guidelines offer no guidance or mandates relating to "noise" or "fumes," and the

-24-

plaintiffs have not pointed to any specific provision of the guidelines or regulations that they contend are violated by those conditions.

In their complaint the plaintiffs also cite in passing 49 U.S.C. § 47107(a)(20), which they contend requires an airport to operator provide "reasonable access" for public transportation providers. That enactment, which sets conditions that airports must meet in order to receive certain federal grants for development projects, states: "The Secretary of Transportation may approve a project grant application under this subchapter for an airport development project only if the Secretary receives written assurances . . . that . . . the airport owner or operator will permit, to the maximum extent practicable, intercity busses or other modes of transportation to have access to the airport, but the sponsor does not have any obligation under this paragraph, or because of it, to fund special facilities for intercity bus service or for other modes of transportation." 49 U.S.C. § 47107(a)(1), (a)(20). The plaintiffs allege that the assigned location in the GTC is unreasonably remote and that the new regulation requiring Michigan Flyer to service two separate stops at the terminal upon request by a passenger is unduly burdensome. However, whether or not those allegations could be proved, the statute in question offers no avenue of relief for these plaintiffs, or any other interested party, because "[a]s several circuit courts have held, 49 U.S.C. § 47107 and its predecessor statute do not create a private right of action for parties aggrieved by alleged discrimination." *McCasland v. City of Castroville*, 514 F. App'x 446, 448 (5th Cir. 2013) (collecting cases) (citing *Northwest Airlines, Inc. v. Kent County*, 955 F.2d 1054, 1057-58 (6th Cir. 1992), *aff'd*, 510 U.S. 355 (1994)).

In all events, the plaintiffs have not stated a violation of Title II of the ADA based on the claim that the pickup and drop-off locations for public transportation bus service to the Detroit Metropolitan Airport are inaccessible.

## 2.  Operational Issues

At oral argument, the plaintiffs took the position that they can prevail under Title II of the ADA even if they cannot establish a violation of any specific provision of the ADAAG, if they can show that the Airport Authority has failed to grant a necessary reasonable modification of its ground transportation policies, where that modification would not fundamentally alter the nature of the Airport Authority's services.  The plaintiffs cite the Ninth Circuit's decision in *Fortyune v. American Multi-Cinema, Inc.*, 364 F.3d 1075 (9th Cir. 2004), and the district court's ruling in *Obert v. The Pyramid*, No. 03-2135, 2005 WL 1009567 (W.D. Tenn. Apr. 8, 2005), in support of this position.

In *Fortyune*, a movie patron who used a wheelchair attended a sold-out show of the movie "Chicken Run" with his wife.  When the couple reached the designated accessible seating area for wheelchair users, they found that a non-disabled moviegoer already was seated in the "companion seat" next to the open space provided for a wheelchair.  Theater attendants, following company policy for sold-out shows, refused to order the non-disabled patron to vacate the companion seat, and the plaintiff and his wife then left the theater, with the wife in tears, and did not see the movie. The Ninth Circuit held that the plaintiff had shown that he was entitled to an injunction requiring the theater to give priority to the companion of a wheelchair-bound patron for use of an adjacent companion seat.  The court held that the fact that the layout of the wheelchair seating area complied with all applicable requirements under the ADAAG was immaterial to his Title II claim, because

-26-

"in cases such as Fortyune's, which concern a public accommodation's policy regarding the use of that design (e.g., the use and availability of a companion seat), the provisions of the ADAAG are not controlling." 364 F.3d at 1085. The court rejected the idea that an ADA plaintiff "must prove the defendant contravened a specific requirement of the ADAAG, to establish a violation of the ADA." *Ibid.* (quotation marks omitted). Instead, the court held, the plaintiff's burden under 42 U.S.C. § 12182 is to show that "the defendant discriminated against the plaintiff based upon the plaintiff's disability by (a) failing to make a requested reasonable modification that was (b) necessary to accommodate the plaintiff's disability." *Id.* at 1082 (citing *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 683 n.38 (2001)).

In *Obert* the district court denied summary judgment to the municipal operator of a stadium concert hall, where it was undisputed that the facility had adequate and conforming handicapped entrances, ramps, curb cuts, traffic lanes, and parking spaces, but, on the date of the concert that the wheelchair-bound plaintiff attended with her husband, all of those accessible entrances to the facility had been blocked off by police cordons, and the plaintiff was turned away from every accessible parking area by police who informed her that those approaches were reserved for use by patrons arriving in busses or limousines. The plaintiff and her husband eventually found accessible parking several blocks away, but, while crossing a street on the way to the concert hall, a wheel of the plaintiff's wheelchair lodged in a sunken trolley track, causing her to be dumped onto the pavement and seriously injured. The district court found that the plaintiff adequately had framed a claim for relief under Title III of the ADA and explained that the facility's nominal compliance with ADAAG design guidelines did not preclude that claim. The court held that "compliance with the ADAAG guidelines does not necessarily preclude recovery under the ADA," where "the issue of concern is

-27-

a public accommodation's policy regarding the use of the design, not the design itself." *Obert*, 2005 WL 1009567, at *5.

The Court agrees that in addition to prohibiting intentional discrimination and requiring that new or altered public facilities comply with the specific requirements of the ADAAG, the ADA also "prohibits public entities from discriminating against individuals with disabilities [by] 'fail[ing] to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.'" *Anderson v. City of Blue Ash*, 798 F.3d 338, 353 (6th Cir. 2015) (quoting 42 U.S.C. § 12182(b)(2)(A)(ii)). The ADA regulations similarly mandate that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

The plaintiffs have stated a viable claim under this theory in their original complaint, where they allege, at paragraph 54(c), that allowing Michigan Flyer to drop them off at Door 402 is a reasonable accommodation that is necessary for them fully to enjoy the air travel services offered to the public at the airport, and that the Airport Authority has not shown that granting the reasonable accommodation they seek fundamentally would alter the nature of those services. At the time the complaint was filed, therefore, that claim would not have been subject to dismissal for failure to plead a plausible basis for which relief could be granted.

-28-

## C.  Equal Protection Claim

For the same reasons already discussed, the plaintiffs have failed to make out any claim under the Equal Protection Clause, principally because they have failed to allege any disparate treatment.  They are offered the same boarding location (and alternative locations) under the Airport Authority's policies as all other members of the general public who ride public busses.  In the absence of any discernible plausible allegation of disparate treatment, there is no viable equal protection claim.

## D.  Mootness

Since the complaint was filed, as the plaintiffs readily acknowledge, the "facts on the ground" have changed.  Since the Airport Authority enacted its new regulations, it now offers the exact accommodation that the plaintiffs demand in their original complaint.  The plaintiffs alleged that the use of Door 402 was necessary as a reasonable accommodation, and the defendant never has addressed whether that modification was reasonable or necessary, or whether the requested accommodation fundamentally would alter the nature of its service.  The individual plaintiffs now have received complete relief as to their request for a reasonable modification, which was, before the new regulations were enacted, a plausibly pleaded claim for relief under Title II.  But there was no facially valid claim pleaded in the original complaint on any basis other than that request for a reasonable modification of the defendant's ground transit policies (i.e., there were no plausibly pleaded claims for intentional discrimination, retaliation, accessibility transgressions, or violations of state law or the Rehabilitation Act).  The only viable claim pleaded in the original complaint is now moot.

"To uphold the constitutional requirement that federal courts hear only active cases or controversies, as required by Article III, section 2 of the federal constitution, a plaintiff must have a personal interest at the commencement of the litigation (standing) that continues throughout the litigation (lack of mootness)." *Barry v. Lyon*, No. 15-1390, --- F.3d ---, 2016 WL 4473233, at *4 (6th Cir. Aug. 25, 2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *Friends of the Earth, Inc. v. Laidlaw Environmental Servs., Inc.*, 528 U.S. 167, 189 (2000)). "Standing is a threshold question in every federal case." *Ibid.* (citing *Miller v. City of Cincinnati*, 622 F.3d 524, 531 (6th Cir. 2010)). "Plaintiffs have standing if they suffer a 'concrete,' 'particularized,' and 'actual' or 'imminent' injury that is caused by a defendant's conduct and is likely to be 'redressed by a favorable decision.'" *Ibid.* (quoting *Lujan*, 504 U.S. at 560-61). "If the plaintiff ceases to have standing such that a live case or controversy no longer exists, the case becomes moot." *Id.* at 5 (citing *Spencer v. Kemna*, 523 U.S. 1, 7 (1998)).

"[A] federal court has a continuing duty to ensure that it adjudicates only genuine disputes between adverse parties, where the relief requested would have a real impact on the legal interests of those parties." *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 584 (6th Cir. 2006) (citing *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992); *McPherson v. Michigan High School Athletic Association*, 119 F.3d 453, 458 (6th Cir. 1997) (*en banc*)). "If 'the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome,' then the case is moot and the court has no jurisdiction." *Ibid.* (quoting *Los Angeles County v. Davis*, 440 U.S. 625, 631 (1979)). "The mootness inquiry must be made at every stage of a case; thus, if a case becomes moot during an appeal, the judgment below must be vacated and the case remanded with instructions to dismiss." *McPherson*, 119 F.3d at 458.

The plaintiffs now argue, and they seek to allege in their amended complaint, that the Airport Authority must provide the same accommodation to all public bus riders, whether or not those persons are disabled, by allowing Michigan Flyer to pick up and drop off *all* of its passengers at Door 402, because doing otherwise would impose an illegal scheme of "segregated stops" prohibited by the ADA. But the plaintiffs have not cited any authority for the remarkable proposition that a "reasonable modification" of a public entity's policy is "discriminatory" or amounts to "segregation" because it is offered only to disabled persons, and the cases that they cite do not support that argument. The ADA mandates integrated facilities and services; it does not require that "reasonable modifications" of public operational policy be fully integrated — or even minimally or nominally integrated. Nor, logically, can any such requirement be read into the law. A reasonable modification is, by definition, a modification of — i.e., a departure from — a public entity's ordinary application or execution of an otherwise integrated and uniformly applied policy, where that departure is necessary to accommodate the individual needs of a disabled person *who requests distinctive treatment*. The plaintiffs cannot logically contend that they are entitled to a modification of the ground transit policy allowing them to use Door 402, and at the same time maintain that allowing them to use Door 402, in order to accommodate their individual needs, "discriminates" against or "segregates" them, merely because the requested accommodation is offered only to the plaintiffs, on an as-needed and as-requested basis, and it is not offered to hundreds or thousands of other air travelers with no disability, who never asked for, and who do not need, the requested individual accommodation.

It is beyond question that the accessible *facilities* here are fully integrated; the south stops at the GTC are usable uniformly by disabled and non-disabled travelers, and so is Door 402. The

plaintiffs contend that they should be allowed the reasonable accommodation of being allowed to board and debark public busses directly outside Door 402 instead of using the south stops. And so they are; the Airport Authority's new regulations expressly permit just that, and they require ground transit providers to honor any passenger's request to use an alternative stop. But that reasonable accommodation is not what makes the facility "readily accessible"; the accessibility determination entirely is addressed by the facility's conformance to the ADAAG, with which it fully complies. The allowance of the requested reasonable modification of the ground transit policies does not make an otherwise accessible facility inaccessible. And it does not result in unlawful discrimination or segregation, where the modification is not required in order to achieve accessibility in the first instance, and it is necessary, so the plaintiffs allege, only to meet their individual needs.

Although the reasonable modification claim, as originally pleaded, was viable, that sole viable claim now is moot, because the plaintiffs achieved all of the relief that they sought when the Airport granted their request for a reasonable modification by enacting the new regulations. Although that lone claim could not be dismissed on the pleadings, it must be dismissed now because it is moot. The complaint, therefore, must be dismissed in its entirety.

### III. Motion to Amend Complaint

The plaintiffs contend that their motion to amend the complaint should be allowed to permit them to add their challenges to the "segregated stops" scheme under the new regulations because (1) the case is in its early stages and discovery has not begun; (2) the defendant is well on notice of their intent to challenge the new regulations, as a result of the litigation on the plaintiffs' emergency motion for a TRO to block those regulations; (3) the plaintiffs made their motion to amend in a timely manner, just two weeks after the Court denied the TRO and the new regulations went into

effect; and (4) the added allegations plausibly state additional claims for relief because the ADA prohibits a public entity from forcing disabled air travelers to use segregated facilities.

Motions to amend before trial are governed by Federal Rule of Civil Procedure 15(a). Rule 15(a)(2) requires a party seeking to amend its pleadings at this stage of the proceedings to obtain leave of court. Although Rule 15(a)(2) provides that "[t]he court should freely give leave when justice so requires," leave may be denied on the basis of undue delay, bad faith by the moving party, repeated failure to cure defects by previously-allowed amendments, futility of the proposed new claim, or undue prejudice to the opposite party. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999); *Fisher v. Roberts*, 125 F.3d 974, 977 (6th Cir. 1997).

A court may deny a motion for leave to amend when the proposed amendment would be futile. *Head v. Jellico Housing Auth.*, 870 F.2d 1117, 1123 (6th Cir. 1989); *Martin v. Associated Truck Lines, Inc.*, 801 F.2d 246, 248 (6th Cir. 1986); *Neighborhood Dev. Corp. v. Advisory Council on Historic Pres.*, 632 F.2d 21, 23 (6th Cir. 1980). If the district court concludes that the pleading as amended could not withstand a motion to dismiss, then the court may deny the motion to amend and save the parties and the court the expense of having to confront a claim doomed to failure from its outset. *Head*, 870 F.2d at 1123 (quoting *Martin*, 801 F.2d at 248). "[A] civil complaint only survives a motion to dismiss if it 'contain[s] sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face.'" *Courie v. Alcoa Wheel & Forged Prods.*, 577 F.3d 625, 629 (6th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

As discussed above, a challenge to the new regulations on the basis that they establish "segregated stops" would not hold up. There are several reasons that this is true. *First*, as noted

earlier, the existing stop in the GTC is accessible according to the applicable ADA Accessibility Guidelines. The plaintiffs have not alleged any facts in their complaint or amended complaint or alluded to any record facts in their briefing that show otherwise. The new regulations do not force disabled air travelers to do anything at all in order to access the defendant's terminal via an ADA-compliant route. *Second*, the regulations allow any passenger to request the use of an alternative stop, for whatever reason the passenger may desire. Ground transit operators are prohibited from making any inquiry about a passenger's disability, and they are required to accommodate a request for use of an alternative stop without question. Further, they are required to discharge all of the requesting passenger's traveling companions and caregivers at the alternative stop, equally without question. And no disabled passenger is required to use an alternative stop; a disabled passenger (or a passenger who merely wants to use an alternative stop, for whatever reason) can ask for an accommodation, or he or she can choose to get on or off the bus at the regular, accessible stop. The only things that a transit operator may not do are proceed to an alternative stop absent a passenger request, or question the basis of a request for an accommodation.

The plaintiffs contend that there is no justification for the Airport Authority to use a two-stop scheme when it could, if it would simply hear the voice of reason, revert to the old scheme of allowing public busses to pick up and drop off all passengers at the alternative spots. Aside from the fact that the plaintiffs' suggestion is not mandated by the ADA, there is a self-evident reason why it is not logistically plausible. The GTC facility contains several unloading and discharge locations that are situated for concurrent use by many different ground transportation providers. The plaintiffs insist that Michigan Flyer must be afforded the exclusive privilege of using one location among those several that it and the plaintiffs prefer. But allowing one provider exclusive use of that

-34-

"preferred" location to discharge all of its passengers, whether or not they have any need or desire for it, would cause obvious delays and problems for all other providers who are allowed to use that spot only when a passenger requests it.  And the problems of such a scheme would be compounded geometrically if every provider were allowed to make the same "exclusive" use of the one or two alternative boarding spots, which would make things worse for all ground transportation passengers at the airport — including, notably, disabled passengers of services other than Michigan Flyer.

At any rate, whatever are the logistical merits of the Airport Authority's regulations, they are immaterial to the question whether its facility and those regulations are ADA-compliant.  The existing stop is accessible, as far as all of the facts alleged in the pleadings (and proposed amended complaint) suggest, and so are the alternative stops.  Disabled passengers may elect between them as they desire, and either option affords an accessible route into the terminal that complies with the ADAAG in all relevant respects.  Whether the new regulations are the most logistically prudent scheme that might be imagined, or the most economical for those transit providers affected by it, are not questions taken up by the ADA.

The motion to amend the complaint will be denied, because the proposed new allegations do not "unmoot" the original claims, or state any new, viable causes of action.

### IV.  Motion for Reconsideration

Motions for reconsideration may be granted under E.D. Mich. LR 7.1(h)(1) when the moving party shows (1) a "palpable defect," (2) that misled the court and the parties, and (3) that correcting the defect will result in a different disposition of the case.  E.D. Mich. LR 7.1(h)(3).  A "palpable defect" is a defect which is obvious, clear, unmistakable, manifest, or plain.  *Mich. Dep't of Treasury v. Michalec*, 181 F. Supp. 2d 731, 734 (E.D. Mich. 2002) (citations omitted).  "Generally

. . . the court will not grant motions for rehearing or reconsideration that merely present the same issues ruled upon by the court."  E.D. Mich. LR 7.1(h)(3).

The plaintiffs argue that the Court erred when it denied the TRO by (1) concluding that previous litigation had resolved the issues in this case, because "the release in *Harris* is unenforceable as a matter of law," and the instant claims arise from changes in the Airport Authority's position that occurred after the *Harris* settlement was reached; (2) finding that the new "segregated stops" are available to "all passengers," because disabled passengers, at least in the case of pickups at Door 402, cannot take advantage of the new stops without an "advance reservation"; and (3) finding that the "segregated stops" are not needed where fully integrated alternative stops are available, which is illustrated by the ongoing use of other locations by the airport's favored providers.  The plaintiffs further argue that the Court applied an incorrect legal standard when it concluded that their claims lacked merit, because they can prevail on their claims even if they cannot point to any aspect of the defendant's facilities that violates a specific provision of the ADAAG, as long as they can prove that the defendant is "*operating* [its] facilities in a manner that illegally excludes or otherwise discriminates against individuals with disabilities."  Plfs.' Mot. [dkt. #40] at 21 (emphasis in original).  The plaintiffs also argue that the Court erred in considering the substance of an FAA decision letter that is inapplicable to the present circumstances, and in concluding that no irreparable harm would result from denying an injunction, because the ruling encourages the use of similar "segregated" alternatives for providing accessibility by other public entities.

The Court denied the emergency motion for a TRO principally because it concluded that (1) all of the plaintiffs' claims were without merit; and (2) the new regulations do not establish "segregated stops," but instead merely offer alternatives to the existing fully accessible stop, which

disabled bus riders can use or not use at their option.  The Court included it its reasoning the idea that the present dispute was fully aired in the *Harris* case, and the settlement of that matter operated as a bar of sorts to the present case.  Although the undersigned does not subscribe to that reasoning, for the reasons noted above, this Court concludes that the plaintiffs' claims lack merit, the other conclusions were correct, and there was, therefore, no palpable defect in the ruling.

### V.  Motion to Intervene

Non-party Michigan Flyer, a provider of public bus transportation to the Detroit Metropolitan Airport, contends that it should be allowed to intervene in the case to express its opposition to the Airport Authority's "continued offensive in [its] mission to eliminate intercity public transportation from [DTW]."  Emer. Mot. [dkt. #40] at 1.  The proposed intervenor argues that (1) the motion is timely because the case is in its early stages, discovery has not yet begun, and the need for intervention was not apparent until the Airport Authority recently issued its new regulations establishing the "segregated stops"; (2) it seeks to protect two substantial legal interests which are (a) to avoid being forced by the new regulations to conduct its services in violation of federal law (e.g., 49 C.F.R. § 37.207(d) (prohibiting bus operators from requiring advance reservations in order to secure accessible service)), and (b) "to avoid providing 'accommodations' that burden and fundamentally alter the nature of [its] service, threatening [its] very existence"; (3) the "financial burden of enacting this plan is [] impractically daunting," because the intervenor "estimates that complying with the regulations will require Michigan Flyer to hire three new bus drivers, and to purchase a new motor coach"; (4) resolution of the issues in this case without allowing Michigan Flyer to intervene "leaves Plaintiff-Intervenors with little or no recourse to

challenge the actions of this public airport"; and (5) the individual plaintiffs cannot adequately protect the bus company's interests.

The emergency motion to intervene will be denied because Michigan Flyer has not shown that it can satisfy the criteria for either mandatory or permissive intervention. Federal Rule of Civil Procedure 24(a) "provides for intervention as of right [to anyone] 'who claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.'" *United States v. City of Detroit*, 712 F.3d 925, 930 (6th Cir. 2013) (quoting Fed. R. Civ. P. 24(a)(2)). Federal Rule of Civil Procedure 24(b) provides that "the court may permit anyone to intervene [who] has a claim or defense that shares with the main action a common question of law or fact."

Michigan Flyer cannot establish the requisites of Rule 24(a) or (b) for at least two reasons. *First*, and foremost, there is no action in which to intervene where the plaintiffs no longer have any claims with colorable merit. As the Sixth Circuit has explained, where the underlying lawsuit is not viable, there is no basis for intervention by anyone:

> Intervention cannot, as a general rule, create jurisdiction where none exists. Intervention "presuppose[s] an action duly brought"; it cannot "cure [the] vice in the original suit" and must "abide the fate of that suit." *United States ex rel. Texas Portland Cement Co. v. McCord*, 233 U.S. 157, 163-64 (1914). As such, a court requires an already-existing suit within its jurisdiction as a prerequisite to the "ancillary proceeding" of intervention. In the absence of jurisdiction over the existing suit, a district court simply has no power to decide a motion to intervene; its only option is to dismiss. This uncontroversial procedural premise finds explicit support from nearly every other circuit.

*Village of Oakwood v. State Bank & Trust Co.*, 481 F.3d 364, 367 (6th Cir. 2007) (citations omitted);

*see also Diamond v. Charles*, 476 U.S. 54, 68 (1986) ("Although intervenors are considered parties

-38-

entitled, among other things, to seek review [on appeal], an intervenor's right to continue a suit in the absence of the party on whose side intervention was permitted is contingent upon a showing by the intervenor that he fulfills the requirements of Art. III." (citations omitted)).

*Second*, the intervenor's putative interest in avoiding being put to undue expense to comply with the new regulations has no substantive legal relationship to the individual plaintiffs' claims that the airport's facilities are inaccessible to them; mere economic concerns about the effect that the litigation may have on third parties are insufficient to comprise a "substantial legal interest" in the proceedings. *Blount-Hill v. Zelman*, 636 F.3d 278, 282 (6th Cir. 2011) ("White Hat's economic interest in the continuation of its contracts with community schools was insufficient to comprise a substantial legal interest for purposes of Rule 24(a) intervention. This [is] because White Hat's interest [does] not concern the constitutional and statutory violations [alleged] in the litigation, but rather an interest in the economic component." (quotations and citations omitted)).

If the intervenor believes that it has been unduly economically aggrieved by the Airport's new regulations then it may file a civil action and pursue its remedies, whatever those may be. And if it fails or refuses to provide accessible public transit services to its riders, then perhaps the plaintiffs may have viable claims under the ADA against Michigan Flyer itself. Those issues, however, have no substantial legal relationship to the individual claims under the ADA that have been raised in this case regarding the accessibility of the defendant's airport terminal.

## VI. Conclusion

The plaintiffs have failed to make out any viable claim for intentional discrimination or retaliation under the ADA, and they have not pointed to any defect in the McNamara Terminal GTC or the situation of the currently assigned public transit bus stop at that facility that contravenes the

-39-

directives of the applicable provisions in the ADA Accessibility Guidelines or any of the ADA regulations or other statutes and regulations that they cite. Although the original complaint stated a claim based on the Airport Authority's operational policies regarding the use of the GTC, that claim is now moot. The plaintiffs, therefore, have no presently viable claims under the ADA, Rehabilitation Act of 1973, or the Michigan Persons With Disabilities Civil Rights Act. They also have failed to make out any viable claim under the Equal Protection Clause. The plaintiffs' proposed amended complaint would be futile, and they have furnished no basis for reconsideration of the order denying the TRO. Non-party Michigan Flyer has not established a right to intervene in this lawsuit, nor has it shown that the Court ought to allow it to do so.

Accordingly, it is **ORDERED** that the defendant's motion to dismiss [dkt. #12] is **GRANTED IN PART**.

It is further **ORDERED** that the plaintiffs' motions for reconsideration [dkt. #53] and for leave to file an amended complaint [dkt. #56] are **DENIED**.

It is further **ORDERED** that non-party Michigan Flyer's motion to intervene [dkt. #40] is **DENIED**.

It is further **ORDERED** that the case is **DISMISSED WITH PREJUDICE**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  September 29, 2016

-40-

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 29, 2016.

s/Susan Pinkowski
SUSAN PINKOWSKI